May it please the Court, Counsel. My name is Ibram Brice and I represent the decedent's son, Adam Tucker. I will be arguing before the Court today on issues of Eighth Amendment and Qualified Immunity. Co-Counsel is Cal Potter. He represents the decedent's wife. He will be arguing issues surrounding municipal liability. The facts of this case demonstrate that Dr. Hoffman, Nurse Bastier, and PHS, formerly IMSA, displayed deliberate indifference towards the serious medical needs of Mr. Tucker in violation of the Eighth Amendment. They did so by failing to provide doctors that were meaningfully in reach, having nurses do tasks beyond their training, failing to properly review patient records, having a business corporation holding itself out as a medical care provider, and having non-doctors promulgate and enforce policies and procedures having to do with the rendering of medical services. Those – that type of conduct evidences a policy and custom of failing to render meaningful medical care, as this circuit has previously enunciated. In order to find an Eighth Amendment violation, as this Court is aware, in essence, a two-part test must be undertaken. The first part is an objective part. The second part is a subjective part. First, there must be a demonstration that the official deprived the prisoner of minimal civilized measures of life's necessities. Here we have that. What greater deprivation could we find than a 44-year-old nurse who was actively paying attention to him and examining him and found him to be asymptomatic at the time she was dealing with him, was deliberately indifferent to – you know, it was so egregious that we have to infer substantively, subjectively, that she recognized and ignored his acute state? That's correct, and that would be the second prong of the test, where you would have to find – this Court would have to find that Nurse Bastier and Dr. Hoffman disregarded an excessive risk to the inmate. Here, it is well established that this 44-year-old man presented himself with symptomology a matter of 45 minutes prior to his dying of tingling in his left arm and of chest pains. He previously told Nurse Bastier that he had had a heart attack, albeit the time frame of the heart attack was uncertain. Knowing this and questioning Mr. Tucker about his symptomology, Nurse Bastier did not even take the measure to pick up the phone and call the on-call physician or Dr. Hoffman. Well, was Dr. Hoffman there on December 20th? Dr. Hoffman was not there, but pursuant to the policies and procedures in place at the facility, if an emergency situation arose or if by its own policies and procedures having to do with the protocol for chest pain, an individual should have been sent out for medical care or Nurse Bastier should have called the on-call physician. So Dr. Hoffman is liable for the nurse's failure to call him to come and render assistance under your analysis of the case? Dr. Hoffman is liable not for the failure of Nurse Bastier, but for his failure to make sure that the policies and procedures as written and drafted are properly implemented. Dr. Hoffman set into motion, if you will, and as this Court is well aware, causation under municipal ‑‑ causation under 1983 can be attributed to an individual if that individual even isn't personally involved. Where in the record, counsel, does it say that Dr. Hoffman wrote the regulations? Dr. Hoffman on the exhibit, on the record on appeal, rather, attached to Applee's Record on Appeal 48. He signed off on the chest pain criteria to send out a patient. He signed off Harvey Hoffman D.O. 12599. According to this document, if any of this findings requiring referral are met, then an individual should be sent out. Here there were at least three that were met. You have a man that's over age 30. Mr. Tucker was 44 at the time of his demise. You have a history of cardiac history. He reported a heart attack and tingling. And you have the presence of suspicious cardiac symptomology. Well, it sounds to me like the protocol is appropriate then. The protocol is ‑‑ there's not a problem with the protocol as written. And that's what he signed off on. That's what he signed off on. But he has the duty as the medical director. He signed off as Harvey Hoffman D.O., regional medical director. He then has the duty under the Eighth Amendment, because Mr. Tucker couldn't take care of himself. He's incarcerated. He had the duty as the medical director to see that these policies and procedures and promulgated were properly enforced such that a constitutional deprivation did not occur. Not only did he not do that in this particular instance, but it would appear that the nursing staff displayed and engaged in an indiscriminatory, invidious discriminatory type conduct, in that in his deposition, Dr. Hoffman states that people lie about their health, and it's our job to decipher our way through all of that, and that it depends not only what is said, but who is saying it and why they might say it. That's not found anywhere within the teaching of the Eighth Amendment or within any of the decisions that this circuit has previously rendered before. So the question Kennedy. Can I ask you this question? What is on the face of the record for Nurse Bestier's own notes is that she was informed that he had the tingling and chest pain and mentioned the prior cardiac history in ambiguous terms. Is it your position that generally accepted medical reaction to that would have been in the face of those three items automatically to seek immediate qualified medical help or give an EKG, do something more than adopt a wait-and-see policy, and if, or is it that you're relying on their protocol that gives you the basis for saying that she ignored, egregiously ignored, the affirmative steps that she should have taken, such as calling the on-call doctor? Which are you, or are you relying on both? Actually, Justice Bishop, we are relying on both. Number one, I believe it's basic medicine 101 that when a man is presenting himself, certainly if you were in an emergency room setting and you went into the hospital and you complained of the type of symptomology that Mr. Tucker had been experiencing, not only on that particular day, but for a week. He had had nausea. He had had vomiting. And they were aware that he had seizures disorders. This was an individual that was well known to the facility. So based upon just common medical knowledge, she should have sent it out. Additionally, which what really makes this rise from a medical malpractice claim, if you will, to the level of deliberate indifference, is that she completely ignored the symptomology pursuant to basic medicine, as the Court has identified, but also based upon a deliberate. She didn't ignore it. She recorded it, and she said, I take this into account and I adopted a wait and see modality here. And that judgment resulted in a very tragic event. There's no doubt about that. You're saying that is elevated from medical malpractice negligence into deliberate indifference because she ignored. But she didn't ignore it. She misjudged. That's why I'm asking, where's the evidence that any medical person, medically trained person that she's supposed to be would have immediately made the on-call, the call to the on-call doctor or ordered an EKG? As this Court is aware, previously the Court in Toussaint and Hottowit addressed issues similar to that which this Court is presenting. In essence, those cases said in order to have medical care, it must be meaningful medical care. At least that's my view of the case. She's begging the question. She's giving him medical care. There's no doubt he's getting medical attention. She's not qualified to make that decision. She's a nurse. Nurses do not make diagnoses. Dr. Hoffman testified that to his deposition. In her deposition, she states that she shouldn't be making a diagnosis, that she makes an assessment. An assessment is an initial her assessment, and probably Nurse Bastier, had she taken the next step in calling the physician on-call, as she should have, pursuant to their own chest pain protocol, pursuant to basic medical 101, as the experts have testified, had she taken that next step, she would have probably been off the hook. But unfortunately, she exceeded her training and abilities and in essence made a diagnosis which ultimately led to the fatal travesty that we have before the Court today. And that's exactly what this circuit talked about in Toussaint and Hoptewitt, that a meaningful medical care must be rendered. One last example, and then I'll have Mr. Potter come up. If Mr. Tucker had presented himself with his arm cut off and had Nurse Bastier put a tourniquet on it, given him an aspirin and sent him back to his cell, under the technical standard of medical treatment, he would have been medically treated. However, would he have been meaningfully medically treated? Absolutely not. It would have resulted in death, just like it did here. Thank you. If we have time, we'd like to reserve two minutes for rebuttal. May it please the Court. When in doubt, send them out. That was the message that Dr. Hoffman was imparting in his deposition and testimony as to what happened here. In terms of the admissible liability, the Court made a determination, such as what the Court had asked today, are the written policies and procedures appropriate? The written policies and procedures were appropriate, as signed off by Dr. Hoffman. The constitutional violation occurs with the ratification by Dr. Hoffman, who is the medical director of this small facility, as well as the very large facility in Clark County, Nevada, under a different municipality. But what occurs here is a situation where a determination from a prior cardiac episode from another individual was never discussed with this particular nurse, nor was the Tucker incident itself ever discussed before or after with this particular nurse. Our argument to the Court is that there is a ratification on the part of Dr. Hoffman, as well as it being the policymaker on medical decisions for IMSA, holding IMSA, now known as PHS or Prison Health Services, likewise liable based upon the fact that there was no action taken. What we had here essentially was the correctional officers bypassing the decision of this nurse or the indecision of this nurse to finally get an EMT into this jail to take care of this man, who in the brink of having pain in the arm, the tingling sensation, all the red or the whistles going off, all the red flags going up, that this man is in a critical situation, being totally ignored by the nurse. Instead, it's a correctional officer that makes that call, the necessary call to have the EMTs come in. And I would submit that based upon that, there is a clear showing of deliberate indifference on the part of the nurse, as well as the failure to train and follow up, as testified to by our expert, Dr. Clark, who was out of the Los Angeles County Jail, that he said that certainly the health care provider in the city of Henderson would have a nursing staff who knew basic nursing 101, that chest pain, tingling in the left arm in a 44-year-old individual with a history of medical problems is something that needs to be evaluated. Could you restate your ratification point? You lost me on the transition there. The ratification is that they did not do any type of follow-up in terms of not only the treatment on this particular individual, Mr. Tucker, but there had been a prior cardiac episode, and nurse pastor testified that she had no knowledge about it, or no one had ever talked to her about those types of protocols. So there's a ratification on the part of Dr. Hoffman, who is the one he says makes all the decisions as medical director on medical decisions, and there certainly wasn't any follow-up on the Tucker matter either. She was never brought forward to go over any of the issues concerning with this. Good morning, Your Honors. May it please the Court. My name is Stiebel Tajira. I'm here on behalf of the appellees. First of all, I'd like to start with regard to the standard of review. Both parties agree that the standard of review in this case is de novo. The Court shall review, conduct a de novo review of the record, and specifically with regard to the motion for summary judgment and the granting thereto. However, as will be presented by myself today and in the pleadings before the Court, it is clear that the decision by the lower court, the Honorable Judge Hunt, made a correct decision in granting the appellees motion for summary judgment. With regard to the Eighth Amendment claim and the 1983 claim, first with regard to Gene Bastyr, as this Court is aware, citation to isolated instances of neglect is not deliberate indifference. It's deliberate indifference. Deliberate indifference is also not an inadvertent failure to provide medical care. Deliberate indifference is also not a mere delay of surgery without more. And deliberate indifference is not a medical – is not a difference of medical opinion regarding individual treatment. Deliberate indifference is also not a misdiagnosis. So what do we do with the Clark declaration? Oh, excuse me. What do we do with the Clark declaration? I apologize. I'm sick. What do we do with the Clark declaration, the expert declaration? I mean, it is true that many malpractice cases do not arise to the level of an Eighth Amendment violation. But here you have a declaration by the expert who says that it does, and one who is qualified to make that statement. Why doesn't that raise a genuine issue of material fact? And if I think – I think if I heard your question correctly, the plaintiffs have presented an expert witness declaration that, first, was based upon he didn't – when he made the declaration, didn't have all of the information available to him, specifically all of the notations of the medical records and all of the policies. Second, even if the court takes as the truth what is contained within the affidavit, it still is not rising to the level of deliberate indifference on behalf of Mary Spacier, at most. And, of course, the appellees deny that there's any liability at all, but at most what the appellants have is a claim of medical negligence, not deliberate indifference. So what do we do with the declaration? You're asking us to ignore it in the calculus. We're at summary judgment stage, so we have to obviously construe the facts in the light most favorable to the plaintiff. You're arguing the facts. They've presented a declaration that said, well, in my opinion, that this arises – this goes to the level of medical indifference – deliberate indifference, sorry. I'm not asking the Court to ignore the declaration that's presented. However, take it in context of what else has been presented and what else has not been presented. Well, in summary judgment, we have to take the facts from the perspective of the plaintiffs in this case. And if we look at that Clark statement, and it's been argued today, it flat-out says this is medical nursing 101. Anybody with any ounce of credible training would have immediately suspected heart attack and taken appropriate action, and she didn't. It sort of reduces it to a fairly simple proposition. So what's the rest of the context? Well, first of all, the statement made by Dr. Clark that it was indifferent or deliberately indifferent, obviously that's a legal conclusion that he's not qualified to do that. But we're not asking that. Okay. But you said look at the rest of the record or whatever it is. That's – sure, we know we don't take the legal conclusion. So what's the – what refutes that so conclusively that it shouldn't be adjudicated by a trier of fact? Well, the fact that Mr. Tucker presented to the Henderson City Jail intoxicated – he had – he was arrested and originally brought to the court – to the jail because he had appeared at court under the influence. He came with a significant medical history, including alcohol abuse, seizure disorders, manic depression, bipolar disease, gastrointestinal disease, and hepatitis C. Now, did Dr. Clark know that when he gave his opinion? As far as I know, he did. Okay. He had access to that portion of the medical records. So what – so you're asking us what? To sit here as adjudicators of medical testimony and decide that that doesn't create an issue of fact? Well, what Dr. Clark – it's my understanding, and I was not at the deposition – but what – it's my understanding that Dr. Clark did not have – I'm not sure if he didn't have a complete set of the medical records or didn't know who made the notations in the medical records and what treatment was provided to Mr. Tucker while at the Henderson City Jail. Well, it sounds like good cross-examination, but why does that change anything in terms of – it sounds like good cross-examination, but why does that change anything in terms of his conclusion? I mean, I realize that one can't create a genuine issue of material fact by opinion, but on the other hand, the opinion is – his opinion in this case is formed by his experience, and he's pointing out why this rises out – rises above the level of ordinary medical malpractice to deliberate indifference. Right. Well, one thing that was not mentioned – I guess what I'm saying is you're quibbling with his – he didn't have enough information, you say. That doesn't make any difference on summary judgment. That's cross-examination material at trial. So I guess what we're trying to focus you on is the declaration and why you think that as a matter of law it's so insufficient as to – so that it doesn't create a triable issue of fact. Well, one thing with regard to the declaration of Dr. Clark is the fact that in hindsight, looking at the autopsy report, we know that he died of a heart attack. He had a myocardial infarction. However, that information was not known – or the indications of that myocardial infarction were not apparent to Ms. Bastier. Regardless, you know, and the defense has produced an expert witness affidavit, Dr. Navratilo, who is a cardiologist, who said it was reasonable for her to see, taking into consideration his past history of gastrointestinal problems as well as the hepatitis C and all of these other complaints that he'd had while he was in jail, including nausea and vomiting, which she had attributed and in fact the doctor had attributed to the gastric problems. That was reasonable. And it doesn't rise to the level of deliberate indifference as the standards are set forth by this court previously. Well, doesn't Dr. Clark say – I believe I'm reading from his deposition where he says, you can't deny a 44-year-old gentleman a long history of chronic diseases presenting chest pains, tingling in the left arm. He describes it as classic heart attack symptoms. And your expert says, no, I'd reach a different conclusion. Doesn't that create a genuine issue of material fact? I do not think so because – well, I don't think I heard the second part of what you're quoting. Long history of chronic diseases, chest pains, tingling in the left arm. He describes it as classic heart attack symptoms. And you're asking if that – I'm asking – and you now have an expert, you tell us, who says, no, that should have been related to his – or could be related to his gastro problems. It seems to me that's a material issue of fact. With all due respect, I disagree that it's a genuine issue of fact. We don't disagree that he had nausea, he had vomiting, and at one point he had tingling in his arm and chest pains. However, when Nurse Bastier examined him, he was asymptomatic. She took the bilateral pulses. She took bilateral blood pressures. She took the respiration. She did a full examination of him and made the assessment that he did not have – that it shouldn't related be his symptoms to the gastric problems. That's not right. Well, what do we do? Let's assume that that's a precise and accurate description of what she did. But what the Dr. Clark declaration and deposition testimony seems to put before us is the idea that anybody with a modicum of medical training would have instantly recognized that among the universe of possibilities, one of them was a heart attack, and that the response to that, the appropriate response, both per your own protocols and per the generally accepted medical reaction, would be to seek either a doctor or call for an EKG, call the EMT. What do we do with that? Well, she went through the protocol that was in effect. She went down the list and did the appropriate medical examinations in terms of checking the blood pressure, checking the heart rate, checking the respirations, taking an evaluation of how he appeared. He appeared pink with no acute distress. He says, in fact, maybe I'm just anxious. He says that he may have had a heart. He said, I think I had a heart attack a few months ago. With all that into consideration, she made the assessment that it was not related to the, didn't even qualify as the classic symptoms. That tells me, again, what she did. I'm trying to get you to answer the, under the Eighth Amendment standard, why what she did isn't objectively and subjectively unreasonable enough, at least on this record, to go to the jury as to whether she, in a legal sense, was deliberately indifferent. Because in the face of this classic symptom, she failed to do what she ought to have done in the face of overwhelming, and I'm overstating it, I suspect, but overwhelming evidence that this man very well might be having a heart attack. What refutes that overstatement, arguable overstatement on my part, what refutes that in the record? The fact that based upon all of his other complaints, she took into effect his medical history and attributed that to the gastric problems. She took everything into consideration, not just his one complaint that he had chest pains, but that at that time when she was making the assessment, he had no apparent or acute distress. This case is very similar to the persuasive case, Bella Courts, which is cited in our motion for summary judgment. It's an Eighth Circuit case in which the inmate or the patient appeared with chest pains, and the doctor said, the doctor also attributed that to the gastric problems. The next day he underwent an EKG, and it was found that he later had a heart attack that prior evening. In that same regard, it was at most a medical misdiagnosis, not deliberate indifference. Well, let me ask you a practical question based on that. I mean, it seems to me, leaving aside medical, the Eighth Amendment claim, they certainly have enough to get to a jury on the negligence claims and medical malpractice claims. Now, if you win here, it goes back to state court. They're going to get a trial on this. As a matter of judicial economy, why not let them have the trial in federal courts and air all these things out? It's a close question, I think, or maybe a close question, on whether or not there's a triable issue of fact on this, but they've come up with more than the usual citations of misdiagnosis. Well, with regard to... I mean, this is the way it plays out, doesn't it? If you win, there's still going to be a trial. It's just going to be in state court on state court law. In fact, there has been a case opened up in state court, actually two cases that were consolidated into one. We have begun discovery. Currently, discovery has stayed because of this matter. Sure. But the judge, according to the statute, has discretion in order... Of course, I'm not arguing that. I'm just, as a practical matter here, we're going to have three cases now going. And we have a question. Because if we disagree with you and send it back, then it's going to be tried on all the issues in federal court. Right. And that is true. But, I mean, the fact that the state court matters have already been opened and discovery has already begun, that's something that I just... Well, in that regard, let me ask you one question that I promise you will not affect our analysis. But would the assistance of the circuit mediator, are you willing to consider mediation of this claim? We've got all these claims in state court. You know you're going to go to trial on that. You may win here. You may lose here. Everybody is at risk. And, in fact, it's far from being resolved. Is that something you would consider? We actually have begun settlement negotiations. We've sort of put it on hold depending on the outcome of this case. But my client is willing to... You don't need to tell me how they want to do it. Those are questions that have nothing really to do with the merits of this case, but I wanted to, I guess, ask about them from a practical point of view. Absolutely. Just to be clear, we have a mediation service here, which is totally voluntary. We just are letting the parties know that it's available. We're not trying to push you into it or anything like that. No. Occasionally, if we did anything, we would send a letter asking if you wanted to participate in it, and it does not affect our decision. But sometimes you see a case where we have an opportunity to resolve issues, and they're quite successful if they've resolved 90% of their cases that they take on. They're one of the most effective units in the nation. And I do have experience with that with Mr. Potter here. With regard to the claims against EMSA, Mr. Potter stated that the Dr. Hoffman and EMSA ratified Ms. Bastyr's decision when they did not, when they did not discipline her or did not discuss it with her. However, they are relying on the lack of discipline, which there is no precedent which states that the lack of discipline shows that there is deliberate indifference on behalf of the entity. As this Court is aware, there is no Respondent Superior with 1983 claims in deliberate indifference, specifically against EMSA and prison health services. And to state that Dr. Hoffman, because he did not discipline her, did not follow up on what she was doing, is deliberately indifferent is contrary to what this case law and the case precedent says. The --"In order to find deliberate indifference against a municipality, the official with final making, with final policymaking authority must ratify a subordinate's unconstitutional decision or action. However, that does not include discretionary actions by the employees." And Jean Bastyr made a discretionary decision when she treated Mr. Tucker and made her assessment of Mr. Tucker's condition. So in order, so to do it any other way would be, in fact, holding EMSA or PHS or Dr. Hoffman as liable on behalf of Jean Bastyr's action in Respondent Superior, which is just unallowed with these 1983 claims. As I've presented in the briefing as well as here today, I firmly believe that the lower court's decision granting the motion for summary judgment should be affirmed by this Court. Thank you, counsel. I would just point out, as the Court has acknowledged, that there is a difference between the affidavits and the opinions of two experts, and that is a situation that should be resolved by the jury. Well, it is, though, except that in fairness to the other side, you can't usually create a tribal issue of fact by expert opinion. What makes this opinion so, or the factual basis of the opinion, so compelling that you think that it raises? I think it's further corroborated by Dr. Tengelhoff, who is the medical examiner, the forensic pathologist. He's hired and paid by the county. He works full time as the medical examiner for the county. He says the same thing as Dr. Clark. First diagnosis is cardiovascular disease, digestive problems, sick throwing up, classic symptoms of heart problems. Tengelhoff then says other symptoms of heart disease, the tingling down the arm, tingling in the neck. He said if an emergency room symptom displayed by Mr. Tucker would have caused the majority of physicians to evaluate the individual right away and probably even admit them at that point in time. He said, finally, it's logical and reasonable to assume better chances to survive if in a hospital setting than if not. And that is the corroboration, if indeed corroboration has to be there. These are the classic signs that are taught anywhere. In fact, I would go back again. The classic sign was acknowledged finally by the correctional officer who bypasses nurse pasteurs in action and finally takes the bull by the horns and makes the calls to the EMT to get the necessary medical attention that should have been made days, if not longer. And him being in there for over a 10-day period with these classic signs throughout that period of time. Thank you, counsel. The case is heard and will be submitted. We'll proceed to the next case on the oral argument calendar, which is Arizona Cartridge Remanufacturers Association v. Lexmark. Thank you. Hold on one second. She's adjusting the clock. Okay. Very good. Good morning, Your Honors. May it please the Court. My name is Ronald Katz. With me is Eugene Hom. I'd like to reserve five minutes for rebuttal. There is a correct way of creating a post-sale restriction without uprooting the important and fundamental concept of privity. That way is actually set out in a case that is cited in our brief, a Federal Circuit case called
judges: Thomas, Fisher, Robart